**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FLOYD J. MCGRONE**<br>**845 Clarence Ave Unit 1**<br>**Oak Park, IL 60304**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**Hon. LLOYD J. AUSTIN III,**<br>**U.S. Secretary of Defense**<br>**1000 Defense Pentagon**<br>**Washington, DC 20301-1000**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. _____

**COMPLAINT**

Floyd J. McGrone, ("Plaintiff" or "Mr. McGrone"), by and through his undersigned counsel hereby brings this against the Defendant, U.S. Department of Defense ("Defendant" or "Agency"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and Age Discrimination In Employment Act ADEA, 29 U.S. Code §§ 623 et seq.

**NATURE OF THE CASE**

1. Mr. McGrone, brings this action seeking declaratory, injunctive, and other appropriate equitable relief, monetary compensatory, and punitive damages, attorneys' fees and costs, against Defendant Agency, for its unlawful and intentional discrimination, perpetrated against him, by its agents and on its behalf, in violation of Title VII, and the ADEA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

2.    Plaintiff has exhausted all his administrative remedies. After filing a timely EEO complaint, Agency investigated. After its investigation, Agency issued a Report of Investigation ("ROI"). Plaintiff opted for the Agency to make a Final Decision ("FAD"). On November 24, 2020, Agency issued its negative, final decision, which was communicated to Plaintiff's counsel on November 25, 2020. Hence, this action is timely.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331. .

4.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391.

## PARTIES

**Plaintiff**

5.    Mr. McGrone is an individual and a resident of the State of Illinois. He is over 40 years of age (65). He is a Black African American male, and a former employee of the Department of the Army. He worked for the Agency in Germany, from 2014 to 2019.

**Defendant**

6.    Defendant the Lloyd J. Austin III, is the United States Secretary of Defense.

7.    Defendant Agency, at all relevant times was Plaintiff's employer at the RGRC in Germany from 2014 to 2019, when he was removed from his position on December 11, 2019, after his tour of duty expired and was not renewed, and he return back to the United States.

## FACTS

### Relevant Work Experience and Accomplishments

### Army Dallas Military MEPS, Texas 3/31/2008 – 7/31/2009

8.      At the Army Dallas Military MEPS, Mr. McGrone was employed as the lead Transportation Assistant responsible for transporting new recruits to their basic training duty stations by procurement of air, and in land conveyances.

9.      As the lead Transportation Assistant, Mr. McGrone was also responsible for bill reconciliation from transport fees for the different services: Army, Air Force, Marines, Navy and Coast Guard. Mr. McGrone had ten (10) separate accounts, two (2) accounts for each Service totaling $2,000,000 apiece respectively. At the end of each month Mr. McGrone paid outstanding balances, acted as the quality assurance technician and was the point of contact for financial institutions on which the credit cards were issued.

10.      Additionally, as the lead Transportation Assistant, Mr. McGrone was responsible for issuing, and issued credit cards through the Bank of America, and was responsible for procurement of travel arrangements and lodging for the commander during travel.

11.      Mr. McGrone issued travel orders for each of the service members (new recruits) departing the second largest MEPS in the United States. He resigned from that job, due to an illness in his immediate family, which required his presence.

12.      During Mr. McGrone's tenure as the lead Transportation Assistant at the Department of the Army, Dallas MEPS, he never received any disciplinary actions, verbal or written. No complaints were made about his ability to do his work, and his evaluation was excellent? Check if he has copy of Evaluation.

**Temple Texas VA Medical Center, Texas, 4/10/2011 – 9/30/2012**

13.     At the Temple Texas VA Medical Center, Mr. McGrone worked as a Transportation Coordinator in a temporary position not-to-exceed two years for one of the new pilot programs transporting veterans to and from their clinical appointments.

14.     That pilot program which Mr. McGrone coordinated, and others like it, were the predecessors of the Veterans Transportation Programs currently being used throughout the United States under the name VTS (Veterans Transportation Service).

15.     As the Transportation Coordinator, he coordinated round trips for veterans in a 150-mile radius with five (5) drivers and two (2) Medical Assistants, ensuring that veterans reached their appointment on time and were returned home safely.

16.     Mr. McGrone also liaised with doctors and mid-level clinicians, social workers and nursing staff to ensure safe and immediate veteran transport when necessary, in multiple scenarios and conditions.

17.     As part of his job, Mr. McGrone maintained contact with drivers through use of new complex software and GPS location equipment that allowed him to assist his drivers with geo-locating areas where there were only country roads, when drivers may not have accurate information on how to enter or exit and make instantaneous changes in real time.

18.     During Mr. McGrone's tenure as the Transportation Coordinator at the Temple Texas VA Medical Center, he never received any disciplinary actions, verbal or written. No complaints were made about his ability to do his work, and his evaluation was excellent? Check if he has copy of Evaluation.

**Denver VA Medical Center 6/30/2014-12/12/2014**

19.    Mr. McGrone was employed as a Health Technician at the Denver VA Medical Center from June 30, 2014 to December 12, 2014.

20.    As a Health Technician, Mr. McGrone was responsible for collection of biological specimens and processing them for analysis.

21.    Mr. McGrone resigned from his position at the Denver VA Medical Center, to take the Transportation Assistant job at the RGRC, and moved from the United States to Germany.

**RGRC Germany 2014-2019**

22.    Mr. McGrone was employed as a Transportation Assistant, GS-2102-07, with the 21st Theater Sustainment Command ("TSC"), 1st Human Resources Sustainment Center, Personnel Accountability Division, RGRC.

23.    Mr. McGrone was the Transportation Assistant for inbound Army Soldiers, civilians, and contractors stationed at locations in Germany, Belgium, and Italy.

24.    As part of his job description, Mr. McGrone coordinated transportation for military and civilian personnel, family members, and contract personnel traveling on permanent change of station (PCS) or temporary duty (TDY) to domestic and overseas destinations.

25.    Mr. McGrone provided technical assistance and advice on traffic management issues for procuring the most economical and efficient utilization of passenger travel services, both air and ground. He monitors, analyzes, and predicts passenger flow for the various categories (i.e., replacement, leave, and unit movement).

26.    Mr. McGrone coordinated military and civilian personnel, family members, and contract personnel lodging, meals, support, and transportation

27.     Mr. McGrone prepared statistical analysis and reports on the individuals that move through United States Army Europe ("USAREUR"), by tracking and compiling personnel data metrics for numbers of soldiers and family to different destinations, total in-processing times and ancillary data.

28.     Mr. McGrone was the only person in the US Army Europe that maintains such statistical information, which is used by the 21st TSC Command, USAREUR G1, for their RFOs and sponsorship metrics. Mr. McGrone's output far exceeded that of his co-workers as Transportation Assistants, because he was in that position prior to any other Transportation Assistant, and had superior on-the-job experience, and prior military transportation operations know-how that he brought with him to his position at the RGRC, than all his counterparts.

29.     Mr. McGrone dedicatedly, consistently, and superbly carried out his job responsibilities at the RGRC for four (5) years. He was the longest serving Transportation Assistant at the RGRC. He had no disciplinary record, oral or written, and in all the annual performance evaluations ("APEs") he received the highest total score and overall rating in each respectively. In each APE, his overall rating was "EXCELLENCE (Exceeds std.)" in all required categories that he was evaluated.

30.     Notwithstanding Mr. McGrone's excellent work record and expertise, because of his race and age, he was never good enough for promotion, or extension of his tour of duty for the management at the RGRC Germany, and he was never good enough, to be accorded the same benefits and privileges of his employment as a Transportation Assistant, as was given to his white Caucasian, and younger counterparts, with less experience, or expertise.

31.     Instead of recognizing Mr. McGrone's accomplishments and, and accord him all the benefits and privileges due to him as a qualified, competent, and excellent worker, with

discriminatory animus, RGRC management connived, systematically schemed and became a

clog in his employment progress wheel, and effectively blocked every and any move he made to

progress in his employment for no legitimate reason, but because he was older, and was an

African American male.

32.     In the face of such egregious animosity, inaction and malfeasance that detrimentally

affected his employment status at the RGRC, Mr. McGrone, requested a meeting with his

relevant lines of supervisors, Mr, Simpson, Cpt. Washingon, and Lt.Col. Parlow, to discuss and

ask them to give him their reason for not giving him the support he needs and deserves, given the

"excellent" work he had done, and continued doing for the Center. They gave him no reason, and

gave him no relevant answers, or assurance that they will make any necessary corrections – all

they did at the meeting was circle the wagon and stone wall him.

33.     Mr. McGrone came to the Ramstein Gateway Reception Center ("RGRC") at Ramstein

Air Force Base, Germany in December of 2014, with about three (3) years of transportation,

passenger movement, and financial logistical experience that was related to operations of the

RGRC.

34.     Mr. McGrone was employed by the Department of the Army, United States Army Europe

(USAEUR), G1, Ramstein Gateway Reception Center, Ramstein, AFB, Germany, as a

Transportation Assistant, at grade GS-2102-07.

35.     Mr. McGrone had exemplary attendance and a work record, of accomplishment and

progressively expanded duties.

36.     During his entire five (5) years' tenure at the RGRC, Mr. McGrone was never

reprimanded, verbally or written, never disciplined verbally or written.

37.     During his entire five (5) years' tenure at the RGRC, no RGRC management official, manager, or supervisor, told Mr. McGrone that he was not doing his job properly, or complained to him of any aspect of his employment or duties that he was lacking in.

38.     During his five (5) years' tenure at the RGRC in Germany, RGRC management conducted Annual Performance Evaluations ("APEs") of Mr. McGrone's work performance starting in 2016. For all those APEs conducted by RGRC management, Mr. McGrone was given the highest achievement ratings.

39.     The APE, evaluation report has four levels of achievement that an evaluated employee is graded or rated. In order of highest achievement these are: (1) "EXCELLENCE (Exceeds std.)" (2) "SUCCESS (Meets std.)" (3) "NEEDS IMPROVEMENT" and (4) "FAILS."

40.     In all the evaluations that was conducted by the RGRC management, Mr. McGrone was rated and given the highest total score and overall rating in each of those APEs respectively. In each, his overall rating was consistently "EXCELLENCE (Exceeds std.)" in all required categories that he was evaluated, and every year that he was evaluated during his tenure at the RGRC.

41.     During his tenure at the RGRC Mr. McGrone made real and continuous contributions to RGRC's operations that included the logistical tracking data he developed that was presented to the Commanding General, Gen. Mohan.

42.     Mr. McGrone worked with the Commanding General's Staff on presentations for the improvement of overall operations at the RGRC - duties he performed without extra pay, but which should have been undertaken by the Operations Chief and Officer in Charge. Yet, he performed these duties in addition to his own regular duties as a Transportation Assistant.

**Discriminatory Treatment – Intentionally Blocking of Promotion to Open Supervisory Position 2017**

43.     Upon information and belief, and based on how he was treated, Plaintiff alleges that Agency and its management at the RGRC Germany, have a discriminatory policy and practice, that preferred younger employees over older ones irrespective of their ability to perform their duties, and irrespective of their experience and expertise that they have and bring to bear in their positions.

44.     Upon information and belief, and based on how he was treated, Plaintiff alleges that Agency and its management at the at the RGRC Germany, have a discriminatory policy and practice, that preferred white Caucasian male employees over black African Americans, irrespective of their ability to perform their duties, and irrespective of their experience and expertise that they have and bring to bear in their positions.

45.     Defendant Agency has a policy and practice of treating its older black African American male disparately from the way it treated its younger white Caucasian male.

46.     Agency discriminated against Mr. McGrone, a black, African American male, who is sixty-five (65) years old, when it treated him differently from his white, Caucasian, and younger counterparts, by promoting them above Mr. McGrone who had superior experience and expertise than them, in the relevant position, and for deliberately and intentionally not extending his tour of duty in Germany, while extending tour for his white Caucasian, and younger counterpart.

47.     Agency also, intentionally, retaliated against Mr. McGrone, based on his prior EEO activities, and complaints against certain management personnel.

48.     Early 2016, Matthew Huffman ("Huffman") a white male, who was younger than Mr. McGrone, was hired at the RGRC on a "not-to-exceed basis" to take the place of another

9

employee that went on active military duty. This means that his hire was temporary, and when the employee on active duty returned, Huffman was to leave that post.

49.    Huffman had no prior experience in the workplace setting, specifically, no transportation, passenger movement, and financial logistical experience that was related to operations of the center, because, prior to being brought on-board to cover for an employee on duty deployment, his job had been selling pizza at the base shoppette.

50.    When the employee who was on active military duty returned from his deployment, Huffman was not asked to leave as he should have. Instead, Huffman was allowed to continue in that position as a Transportation Assistant without any competition, and Mr. McGrone was tasked to train him, and he did.

51.    Sometime towards late 2016-2017, a position for a Transportation Supervisor became open. But Mr. McGrone's superiors, in his line of supervision, specifically Mr. Simpson and Lt. Col. Parlow, connived against him, by deliberately and intentionally making discriminatory decisions regarding the open Supervisory position that made it impossible for him to apply and compete for the open position.

52.    While denying pretext, and that he [Lt. Col. Parlow] discriminated against Mr. McGrone based on his race and age, Lt. Col. Parlow described Mr. McGrone as a "malcontent," "who he could not promote."

53.    Mr. McGrone in 2016, was the most qualified person to step into the position of Transportation Supervisor seamlessly, because he had a total of five (5) years solid on-the-job relevant transportation experience and expertise, at the RGRC, at the time. Yet the younger, white Caucasian employee without experience, and who had been on the job for less than a year, on the job as Transportation Assistant, was promoted.

54.     Mr. McGrone's previous transportation experience, was undoubtedly why he was the successful candidate when he was hired for the RGRC Transportation Assistant position in Germany, from the United States, in the first place.

55.     Sometime, in early 2017, Mr. McGrone went on a two (2) weeks leave, and traveled to the United States. Before he took his leave, the Supervisory position was not advertised, and no one informed him before he left, that the position would soon be advertised soon or on the date of his departure to the United States on leave.

56.     Management and Personnel were all aware that Mr. McGrone would be on leave for two weeks on certain dates, because it was an approved leave, or they should have known.

57.     However, on his return back to Germany after his two weeks leave in the United States, Mr. McGrone discovered that the Supervisory position was made advertised and made open, on the same day he left Germany and traveled to the United States for two weeks leave, and after he had had already departed Germany.

58.     Mr. McGrone also discovered, that the closing day for applications for that Supervisory position, closed on the Sunday, before the next day – the Monday, that he resumed work, after his return from his leave in the United States.

59.     Due to the timing of the advertising of the Supervisor position, and the opening and closing period for application, (which was intentionally and discriminatorily calculated to prevent Mr. McGrone from knowing of the job opening, and to prevent him from applying), he did not know about the job opening, and as a consequence, was prevented from applying the Supervisor position. Mr. McGrone never stood a chance, and that position was given to a younger, white Caucasian male named Byron Jordan, who came to the RGRC, after Mr. McGrone had already been there for couple of years, working as a Transportation Assistant.

60.     About early 2017, Byron Jordan ("Jordan"), a younger white Caucasian male, who had knowledge of the advertisement and opportunity to apply, for Supervisor position was given the position, under circumstances that made it impossible for Mr. McGrone to apply and compete for that position, because he was on leave when the job opening was announced, and closed, before he returned from leave, and knew about it.

61.     When Jordan was hired, Mr. McGrone had been working at the RGRC as Transportation Assistant for over two (2) years, going on to three, and was very conversant with what the job entailed and was better placed to supervise other Transportation Assistants. Instead, Jordan who did not have comparable experience, was then made to become Mr. McGrone's supervisor.

62.     Realizing the wrongful discrimination, and intentional denial of meritorious opportunity perpetrated against him by Defendant through its management personnel and agents, by intentionally blocking him from knowing and applying for an open job that would have amounted to a promotion for him, and as a result, depriving him of the benefits and privileges of his employment with the Army, Mr. McGrone filed an EEO complaint alleging discrimination and that his supervisor, Mark Simpson colluded with the CPAC (Human Resources) in blocking him from being able to apply and be considered for the supervisor position, which he clearly was qualified for.

63.     After Jordan was hired as Supervisor, he became Mr. McGrone's supervisor in 2017 even though Mr. McGrone has done the same kind of job which the white Caucasian, and younger Jordan was to supervise him on, for the best of five (5) years – about three (3) years at the VA in the United States, and over two (2) years at the RGRC in Germany.

64.     Prior to Jordan becoming the Transportation Supervisor and Mr. McGrone's first line supervisor and boss, Mr. Simpson, Chief of Operations, was Mr. McGrone's first line supervisor

and boss. After Jordan left his Supervisory position for another job in Stuttgart, that position still was not offered to Mr. McGrone despite his known experience and expertise, and his stellar employment performance record at the RGRC in Germany, and Mr. Simpson, Chief of Operations, once again, became Mr. McGrone's first and second line supervisor at the same time.

65.     While being hired as Supervisor, and effectively made to supervise Mr. McGrone, it turned out that Jordan did not know what to do as a Transportation Supervisor.

Jordan, while officially Mr. McGrone's boss, ironically had to rely on Mr. McGrone's advice and expertise, in order to carry out his supervisory duties of supervising Transportation Assistants at the RGRC in Germany, including Mr. McGrone who was prevented from getting the promotion.

66.     While on a higher grade, and pay than Mr. McGrone, Jordan routinely asked for, and received Mr. McGrone's assistance, advise, mentorship, and instruction on the transportation operations which he was supposed to perhaps have superior qualification and expertise to do, than Mr. McGrone.

67.     Although the irony was not lost on Mr. McGrone, it did not stop him from assisting - literally teaching Jordan what the transportation operations at RGRC, entailed, or was all about. But, Jordan did not tell RGRC management or his supervisors that he did not know what to do, or, the fact that he was asking Mr. McGrone for assistance, in doing his job, that management took pains to ensure that McGrone, who now was teaching him [Jordan], did not know about, compete for or get.

68.     Jordan worked at the RGRC for a little over a year, before leaving his Transportation Supervisor position at the RGRC to take another job in Stuttgart Germany.

69.     Unfortunately, it would be later known that Jordan was terminated from his new job in Stuttgart Germany, for being intoxicated on duty at his new position – a fact that was gossiped about, and well known at the RGRC.

**Retaliation - RGRC Management's Failure to Timely Complete and Remit Application Package to VA Medical Center Denver United States**

70.     After Byron Jordan, who was not experienced to do the supervisory job, was given the Supervisory position over him, Mr. McGrone, understood that he could not get fair treatment at the RGRC, so he planned to return back to Denver where he was before taking the job at the RGRC Germany.

71.     He applied for, and was offered a position at the Denver VA Medical Center in the U.S. sometime around April or May of 2017.

72.     All Mr. McGrone needed, was to have his application package properly completed by the CPAC or Human Resources ("CPAC") or ("HR") in Kaiserslautern (which was their responsibility). However, because he had filed a previous EEO Complaint naming his supervisor and the CPAC/HR, they retaliated against him by refusing to process his application package and transfer to the Denver VA, causing him to lose the offer.

73.     CPAC or HR, deliberately and intentionally did nothing, despite several reminders from Denver, through emails, requesting for Mr. McGrone's job transfer package as it were, Mr. McGrone's supervisors in concert with CPAC or HR staff, did nothing, and the deadline for the submission ran, and Mr. McGrone lost the position and as a result was not able to leave his position in Germany for the job offer he had already been offered.

74.     The retaliation was obvious, as Mr. McGrone was returning to the same VA Medical Center he departed from, when he took the Transportation Assistant Job in 2014, and moved to Germany, and the process would have been smoothly done without any hitches, but his superiors

and CPAC/HR who he had filed a previous EEO complaint against, deliberately and as a pay-back, failed to send the required package on time, to Denver, despite several reminders from Denver to send it.

75.    RGRC, its managers and CPAC/HR personnel, continuously deceived, lied to Mr. McGrone, made excuses, and in the end, intentionally and deliberately, failed to complete the package which they were supposed to do, and neve forwarded it to Denver, to his detriment.

76.    As a consequence, Mr. McGrone, was unable to go back to Denver for that job, and had to stay in Germany at RGRC, and continue suffering the connived discriminatory animus, intimidation and humiliation from his superiors, until his departure from Germany at the end of 2019, without securing a job in the United States before leaving.

**Discrimination and Retaliation, Refusal to Submit/Resubmit adequate OTER for Plaintiff.**

77.    In mid-2018, RGRC hired two (2) younger white Caucasian males, Richard Murray, and John Lestage as Transportation Assistants with no experience. Mr. McGrone was asked to precept and train both new hires, which he did. In addition, Jordan gave Mr. McGrone the assignment to tutor Lt Col. Richard Murray as he was a Lt Col. in the Air Force Reserve, with no transportation experience.

78.    Murray was also at the end of his "5-years" tour of duty. However, he shared with Plaintiff that their supervisor Mark Simpson, told him not to worry about extension of his tour.

79.    So when Murray wanted to extend his tour, an Overseas Tour Extension Request ("OTER") for an additional year, was prepared by Simpson and forwarded for approval on behalf of Murray. First it was returned and had to be resubmitted.

80.     Along with Cpt. Nina Washington, Mr. Simpson and Murray discussed, worked together, prepared a second OTER, and resubmitted it for approval and it was later approved and Murray's tour of duty in Germany was extended for another additional year.

81.     At the same time as the two new white employees were hired, Mark Simpson, without Mr. McGrone's knowledge or input, deliberately and intentionally forwarded an improperly or inadequately drafted OTER on behalf of Mr. McGrone, which was referred back to "supervisor."

82.     On July 13, 2018, Mr. Simpson submitted an OTER on behalf of Mr. McGrone. On September 18, 2019, the request was not granted but was referred back by Col. Matthew Rasmussen to supervisor who submitted it, i.e. Simpson, for certain correction and resubmission, because the initial submitted OTER was weak and not properly constructed as was required, for approval.

83.     Mr. Simpson did not inform Mr. McGrone that he was submitting an OTER on his behalf, and never discussed it with him, but says that he [Simpson]was "prompted by USAREUR staff to submit all requests for extensions for the fourth quarter" so he submitted one for Mr. McGrone – albeit, intentionally weak and inadequately prepared OTER.

84.     Lt. Col. Parlow claims that Mr. Simpson submitted the OTER on behalf of Mr. McGrone, without discussing it with him or with Cpt. Washington. But Lt. Col. Parlow knew all about Mr. McGrone's OTER, including its disapproval, and the reason USAREUR gave for its disapproval.

85.     According to Lt. Col. Parlow, "the USAREUR Headquarters called and stated that the justification submitted with the extension for Complainant was weak and would be disapproved," in other words, the OTER Simpson, submitted on behalf of Mr. McGrone, did not make a strong case or give the required persuasive reason for extending Mr. McGrone's tour, like they did for Mr. Murray.

86.    Furthermore, according to Lt. Col. Parlow, "even if the request was rewritten, it was likely to be disapproved." However, Lt. Col. Parlow has never explained to Plaintiff, why a resubmission would have been likely to be disapproved, or why that would be the case, but it was not in Murray's case.

87.    Due to Mr. McGrone's supervisor's discriminatory animus towards him, specifically Mr. Simpson and Lt. Col. Parlow, Mr. McGrone's OTER was never resubmitted and his tour of duty was never extended because of their unlawful discrimination against him on the basis of his age race, and prior EEO activity.

88.    At all relevant times, Lt. Col. Parlow, a white Caucasian male, was the Chief of Personnel and Accountability, 21st Theater Sustainment Command, 1st Human Resources Sustainment Center (HRSC), Personnel Accountability Division, Ramstein, German.

89.    Lt. Col. Parlow was born in 1972, and was sixteen (16) years younger than Mr. McGrone, and at all relevant times, he was Mr. McGrone's superior, and as such, has the power to make decisions that can positively or negatively affect Mr. McGrone's employment at the RGRC.

90.    In his position as the Chief of Personnel and Accountability, 21st Theater Sustainment Command, 1st Human Resources Sustainment Center (HRSC), Personnel Accountability Division, Ramstein, German, Lt. Col. Parlow had knowledge of, was involved in, and played a substantial role in all personnel matters concerning Mr. McGrone's, employment, including but not limited to, and specifically as is relevant here, preparing and sending his job transfer package to Denver on time (so he can return to the U.S. and have a job, since Parlow had no intention of extending Mr. McGrone's tour), granting Mr. McGrone an OTER, or promoting Mr. McGrone to a Supervisory level.

91.     Lt. Col. Parlow and Mr. Simpson were the officers who rated Mr. McGrone when deciding whether he is to be promoted or not.  Lt. Col. Parlow was a senior rater to Mr. Simpson – he was Mr. Simpson's second line supervisor, as such, every action Mr. Simpson took regarding Mr. McGrone, inevitably would be run Lt. Col. Parlow.

92.     Mr. Murray's OTER was resubmitted to correct previous errors, without anyone foretelling him that even if his OTER was resubmitted, "it was likely to be disapproved." Mr. Murray's OTER was resubmitted and later granted a one year extension, while Mr. McGrone's was not even resubmitted.

93.     Mark Simpson, and Lt. Col. Parlow, deliberately, and intentionally sent an improperly prepared OTER for Mr. McGrone, knowing full well that it would be rejected, in retaliation, because Mr. McGrone had filed and earlier EEO action against them.

94.     Also, to retaliate further against Mr. McGrone, Simpson and the CPAC used the denied/returned OTER as a pretext to keep him from being considered for Supervisor position, by failing to work with Mr. McGrone, properly rewrite and resubmit his OTER, as Simpson, Washington and the CPAC did with Murray in correcting his case and getting him a grant of one year extension.

95.     After deliberately, intentionally, and discriminatorily frustrating Mr. McGrone's opportunity to extend his tour of duty without any justification, by not properly resubmitting his OTER, Mr. Simpson, and Lt. Col. Parlow also continued their orchestrated and systematic blockage of any and every employment move that Mr. McGrone made, that will be beneficial

96.     Mr. Simpson, and Lt. Col. Parlow connived and denied Mr. McGrone's attempt to enlist in the priority placement program ("PPP"). And when he asked their reason for denying him PPP, they pretextually concocted and answer that makes no sense, but highlights their unlawful

discriminatory scheme of denying Mr. McGrone benefits and privileges that other male

Transportation Assistants at the RGRC, who were white Caucasian, and younger, enjoyed.

97.     In November 2019, Mr. McGrone attempted to enlist in the priority placement program

but was denied. Because he had filed an earlier EEO action against his superiors and the CPAC,

they used the OTER as pretext in not allowing him into the PPP program, which will enable him

to continue his employment.

98.     The reason Mr. McGrone's superiors gave him was that he had not signed up for the PPP

in time, although the OTER only required that an employee not sign up "earlier than six months

before end of tour."

99.     At the time Mr. McGrone attempted to sign up and was not allowed to do so, he would

not have violated the "earlier than six months before end of tour" rule. In fact, his tour was to

end in December, and Mr. McGrone was on time to register for PPP. His superiors excuse, was

simply a lie, a cover up and pretext for discriminatorily blocking him from registering while not

blocking others.

100.    The, calculated, deliberate, and intentional actions of Mr. Simpson, and Lt. Col. Parlow,

in not promoting Mr. McGrone, in derailing his OTER, and in blocking him from registering for

the PPP, foreclosed him from all benefits and privileges, including any chance or opportunity for

future promotions for Mr. McGrone, at the RGRC, as it effectively marked the end of his tour of

duty in Germany.

**Discrimination – Promotion of LaStarge's to Supervisory Reception and Assignment
Specialist position Over Plaintiff**

101.    Complainant's first level supervisor, Mr. Mark Simpson, had the Supervisory Reception

and Assignment Specialist position that had become vacant. In the interim, Mr. Mark Simpson,

was Supervisor Theater Operations and Gateway Specialist, GS-0301-11, RGRC, Mr.

McGrone's second level supervisor, who also acted as Mr. McGrone's first level supervisor, at

the same time. Mr. Simpson, born in 1960, was four (4) years younger than Mr. McGrone.

102.    In 2019, the Supervisory Reception and Assignment Specialist position was advertised

and Mr. McGrone applied for it, and he was qualified for the position, and was informed that he

qualified for the position.

103.    After being told that he was qualified for the position, that was all he heard regarding the

position until he was later informed that he was not selected, for the position but someone else –

Mr. John Lestarge ("Lestarge").

104.    Despite his longer tenure (five years) than Lestarge, doing the relevant Transportation

reception work at the RGRC Mr. McGrone was not even given an interview. Other

Transportation Assistants at the RGRC, who applied for the position, were all listed and

interviewed except Mr. McGrone.

105.    Due to the excellent work he had done in his position, Mr. McGrone was able to speak to

managers from the Central Processing Facilities (CPF) at major army bases in Germany and

Italy, who were willing to give him references for the promotion position, but he never got that

far, because he was not even interviewed because Mr. Simpson and Lt. Col. Parlow had already

decided that they no longer want him there because of his age, race and his prior EEO activity.

106.    On or about March 27, 2019, Mr. McGrone became aware that Lt. Col. Parlow did not

select him for the Supervisory Reception and Assignments Specialist position, but had selected

John Lestarge, a new employee and younger white Caucasian male with less than six (6) months

experience as Transportation Assistant (who Mr. McGrone had trained and continued to train),

even though Mr. McGrone was best qualified than all interviewees, for a position in which he

had been performing the duties as a de facto supervisor, because Byron Jordan was new and did

not know the job, both during his (Jordan's) tenure and after his departure in October 2018.

107.    Mr. McGrone believes that Mr. Simpson and Lt. Col. Parlow not interviewing him,

listing him, and not promoting him, even though he had been adjudged qualified, was

intentionally discriminatory, and based on his race, age, and prior EEO activity.

108.    His third-level supervisor was Cpt. Nina Washington, Officer in Charge ("OIC") of

RGRC, until January 2019. Ms. Washington, born in 1979, was twenty-three (23) years younger

than Mr. McGrone, and w

109.    When Cpt. Washington left in January 2019, Cpt. Aaron Johnson became the OIC for the

RGRC, and to wit, Mr. McGrone's third-level supervisor. Cpt. Johnson, born in 1977, was

twenty-one (21) years younger than Mr. McGrone.

110.     Mr. John LeStarge, a white Caucasian male, who was selected over Mr. McGrone, for

the Supervisory Reception and Assignment Specialist position, effective March 31, 2019. Mr.

LarStarge was born in 1983, and was twenty-seven (27) years younger than Mr. McGrone.

**COUNT I**
**Race, and Color Discrimination under 42 U.S.C. §§ 2000e et seq.**
**(Disparate Treatment)**

111.    Plaintiff hereby incorporates by reference the preceding paragraphs.

112.    Under Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice

for an employer to fail or refuse to hire or discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation, term, conditions, or privileges of

employment, because of such individual's color, religion, sex, national origin, or to limit,

segregate, or classify his employees or applicants for employment opportunities or otherwise

adversely affect his status as an employee, because of the individual's race, color, religion, sex, or national origin.

113.    At all relevant times, Defendant Agency was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

114.    At all relevant times, Mr. McGrone, a black African American male, was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

115.    Agency discriminated against Mr. McGrone based on his race and color, when it intentionally foreclosed Mr. McGrone, from knowing that there was a vacant promotion position, by announcing the position, and closing period for application when he was on leave in United States and as a result was unable to apply or compete.

116.    Agency discriminated against Mr. McGrone when it promoted Mr. Jordan over him, even though he was more qualified than Jordan, just because he was a black African American male.

117.    Agency discriminated against Mr. McGrone based on his race and color, when he was not promoted, and a white Caucasian male John Leastarge who Mr. McGrone was more qualified than, and trained, was instead promoted.

118.    Agency also discriminated against Mr. McGrone based on his race and color, when a white Caucasian male Mr. Murray's OTER was resubmitted and approved while Mr. McGrone' was never resubmitted or approved, by same supervisors for both.

119.    Agencies unlawful actions against Mr. McGrone, as highlighted in this Complaint, are retaliatory, and violate his rights under 42 U.S.C. §§ 2000e et seq.

120.    As a result and proximate cause of Agency's retaliatory actions, Mr. McGrone suffered intimidation, humiliation, loss of job security, anxiety, loss of confidence, and financial damage, and continues to suffer, for which Agency is responsible to him in damages.

## COUNT II
### Race, and Color Discrimination under 42 U.S.C. §§ 2000e et seq.
### (Retaliation)

121.    Plaintiff hereby incorporates by reference the preceding paragraphs.

122.    Agency, through its management, managers and agents, retaliated against Mr. McGrone,

in violation of 42 U.S.C. §§ 2000e et seq., when they took the several discriminatory actions as

highlighted herein in this Complaint, against him, in retaliation, and because of his prior EEO

activities.

123.    Agencies unlawful actions against Mr. McGrone, as highlighted in this Complaint, are

retaliatory, and violate his rights under 42 U.S.C. §§ 2000e et seq.

124.    As a result and proximate cause of Agency's retaliatory actions, Mr. McGrone suffered

intimidation, humiliation, loss of job security, anxiety, loss of confidence, and financial damage,

and continues to suffer, for which Agency is responsible to him in damages.

## COUNT III
### Age Discrimination under the ADEA, 29 U.S. Code §§ 623 et seq.
### (Disparate Treatment)

125.    Plaintiff hereby incorporates by reference the preceding paragraphs.
.
126.    Age Discrimination Act of 1967, 29 U.S. Code § 623, provides:

> (a) Employer practices: It shall be unlawful for an employer—

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

> (3) to reduce the wage rate of any employee in order to comply with this chapter

127.   At all relevant times, Agency was Mr. McGrone's employer, as defined under 29 U.S. Code § 623, and Mr. McGrone is an individual covered under the section because he is over 40 years of age.

128.   Agency discriminated against Mr. McGrone based on his age, when it intentionally foreclosed Mr. McGrone, from knowing that there was a vacant promotion position, by announcing the position, and closing period for application when he was on leave in United States and as a result was unable to apply or compete.

129.   Agency discriminated against Mr. McGrone on the basis of his age, when Mr. Jordan who was younger, and who Mr. McGrone was more qualified than, was promoted over Mr. McGrone, just because he was older - sixty-five (65) years of age.

130.   Agency discriminated against Mr. McGrone based on his age, when he was not promoted, and a younger male John Leastarge was promoted instead. Agency also discriminated against Mr. McGrone, when Mr. Murray who was younger than Mr. McGrone submitted an OTER which was returned and resubmitted and approved, and Plaintiff's was not resubmitted, by same supervisors for both, and never approved, based on his age.

131.   Agencies unlawful actions against Mr. McGrone, as highlighted in this Complaint, are discriminatory, and violate his rights under the ADEA.

132.   As a result and proximate cause of Agency's discriminatory actions, Mr. McGrone suffered intimidation, humiliation, loss of job security, anxiety, loss of confidence, and financial damage, and continues to suffer, for which Agency is responsible to him in damages.

## COUNT IV
### Age Discrimination under the ADEA, 29 U.S. Code §§ 623 et seq.
### (Retaliation)

133.   Plaintiff hereby incorporates by reference the preceding paragraphs.

134.   Agency, through its management, managers and agents, retaliated against Mr. McGrone, in violation of ADEA, when they took the several discriminatory actions as highlighted herein in this Complaint, against him, in retaliation, and because of his prior EEO activities.

135.   Agencies unlawful actions against Mr. McGrone, as highlighted in this Complaint, are retaliatory, and violate his rights under the ADEA.

136.   As a result and proximate cause of Agency's retaliatory actions, Mr. McGrone suffered intimidation, humiliation, loss of job security, anxiety, loss of confidence, and financial damage, and continues to suffer, for which Agency is responsible to him in damages.

WHEREFORE, Plaintiff respectfully request the following relief from this Court:

A.   Declare that Defendant discriminated against Plaintiff based on his race and color, in violation of Title VII and award him damages in the amount of $350,000;

B.   Declare that Defendant discriminated against Plaintiff in violation of Title VII by retaliating against him and award him damages in the amount of $350,000;

C.   Declare that Defendant discriminated against Plaintiff based on his age, in violation of the ADEA and award him damages in the amount of $350,000;

D.   Declare that Defendant discriminated against Plaintiff in violation of the ADEA retaliating against him and award her damages in the amount of $350,000;
.
E.   Award Plaintiff monetary damages, in back pay to include, lost wages, fringe benefits;

F.    Award Plaintiff front pay in lieu of reinstatement;

G.   Punitive damages, as is necessary;

H.   Attorneys' fees and costs;

I.   Injunctive relief, to prevent Agency for further violations;

J.   All other and further relief as this Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Trial by Jury is demanded on all issues triable by a jury.

Respectfully submitted this 23rd day of February, 2021.

> _/s/ Stephen Christopher Swift_
> Stephen Christopher Swift
> D.C. Bar No. 428459
> Swift & Swift, Attorneys at Law, P.L.L.C.
> Suite 200
> 2121 Eisenhower Avenue
> Alexandria, Virginia 22314-4688
> Telephone: (703) 418 – 0000
> Facsimile: (703) 535 – 8205
> E-mail: steve@swift.law.pro
>
> _Attorney for Plaintiff Floyd J. McGrone_